**RECEIVED**
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
ALEXANDRIA, LOUISIANA
DATE 3 / 29/ 14
BY M3

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

CITGO PETROLEUM CORP.                         CIVIL ACTION NO. 2:15-01664

VERSUS                                         JUDGE JAMES T. TRIMBLE, JR.

LAKE CHARLES METAL TRADES COUNCIL, ET AL      MAG. JUDGE KAY

**MEMORANDUM RULING**

Before the court is a motion for summary judgment by Citgo Petroleum Corp. ("Citgo")

(R. #21) and a motion for summary judgment by Nick Kyle, Lake Charles Metal Trades Council,

Local 407 International Union of Operating Engineers ("defendants") (R. #22).  For the reasons

that follow, the motion for summary judgment filed by Citgo will be granted and the motion for

summary judgment filed by defendants will be denied.

**STATEMENT OF FACTS**

Defendant, Nick Kyle, was an employee of Citgo and formerly a bargaining unit employee

at Citgo where he was represented for collective bargaining purposes by the Lake Charles Metal

Trades Council ("LCMTC") and the International Union of Operating Engineers, Local Union No.

407 ("IUOE Local 407"). While employed by Citgo, Kyle worked as an E Operator at the tank farm

where he was tasked with gauging and inspecting 200 individual tanks each month to verify the

tank levels and inspect their condition; these tanks contain benzene, caustic materials and

gasoline components. Operators gauge and inspect the tanks to ensure that the equipment is

functioning properly, to prevent tanks from overflowing, and to comply with Citgo's obligations

to pay taxes on the actual product inventory stored in the tanks.

1

There are specific procedures set forth in Company Procedure SOP-343.5-306 which was revised in September 2013 to ensure that the company was in compliance with the American Petroleum Institute standards.  Kyle and other operators attended a training session regarding the revisions to this procedure.

Gauging a tank requires an operator to enter three gauge readings into an IntelaTrac handheld device. The three gauge readings are: side gauge, hand gauge and K-20 gauge.  The operator actually measures the side gauge and hand gauge himself.  The operator calls the OMB Chief Operator who reads the K-20 console data to the operator who then enters that data into the IntelaTrac Handheld device. Under the September 2013 revised Company Procedure SOP-343.5-306, any discrepancy greater than one-inch between the side gauge, hand gauge and the K-20 reading requires a work request to repair and recalibrate the tank level indicators. Any significant deviations between the hand gauge, side gauge and K-20 gauge must be reported to the Chief Operator.  The actual tank levels are reflected in the Plant Information ("PI") system. The PI system data are funneled from the K-20 gauge reading, so the K-20 gauge reading and the actual tank level reflected in the PI system should always match.

On November 7, 2013, Kyle entered data for three tanks that did not match the actual tank levels as reflected in the PI system. For Tank 199, Kyle entered the following tank levels:

- Hand gauge: 9 feet, 1 inch;

- Side gauge: 9 feet, 1 8/16 inches;

- K-20 gauge; 9 feet, 1 10/16 inches.

The PI system data for November 7, 2013 showed that the actual tank level for Tank 199 was 21 feet, 7 inches.

For Tank 198, Kyle entered the following tank levels:

- Hand gauge: 17 feet, 2 inches;

- Side gauge: 17 feet, 2 8/16 inches;

- K-20 gauge: 17 feet 2 7/16 inches.

The PI system data for November 7, 2013 showed that the actual tank level for Tank 198 was 15 feet 1 14/15 inches.

For Tank 225, Kyle entered the following tank levels:

- Hand gauge: 6 feet, 10 inches;

- Side gauge: 6 feet, 10 6/16 inches;

- K-20 gauge: 6 feet, 10 6/16 inches.

The PI system data for November 7, 2013 showed that the actual tank level for Tank 225 was 3 feet, 9 12/16 inches.

Due to an audit, Citgo discovered the discrepancies. As part of their investigation involving these discrepancies, Citgo reviewed the data Kyle entered in the IntelaTrac (as well as other operators) and compared it to the PI system data for the same time frame. Afterwards, in a meeting with Kyle, Kyle informed management that he did not take the gauge readings himself, but witnessed other inspectors gauge Tanks 199 and 198 and used their data to enter his readings into the IntelaTrac (this use of an inspector's data by an operator is commonly referred to as a

3

"freebie"). Citgo investigated Kyle's claims and discovered there was no inspector on Tank 199 and the inspector who gauged Tank 198 said that Kyle was not present when the tank was gauged. After presenting this information to Kyle, he changed his story and claimed that he had only been giving "scenarios" of what could have happened. Kyle also notes that the investigation took place over two months after the gauge readings were taken.

Further investigation revealed that Kyle had completed the gauging and inspection procedures in 3 minutes (Tank 199), 4 minutes (Tank 198) and 2 minutes (225); the usual time for gauging and inspecting a tank takes approximately 30 minutes to complete. Citgo ultimately concluded that Kyle had knowingly and intentionally violated the procedure for gauging tanks, and then gave false information during the investigation to conceal his wrongdoing. Citgo discharged Kyle on February 17, 2014 for violating its standard operator procedure and Citgo's Discipline Rules 4 and 21 which relate to dishonesty and/or giving false information during an investigation.

Relevant to the discharge is the collective bargaining agreement ("CBA") between Citgo and the Union. Article X of the CBA reserves to Citgo management certain rights: (1) "[t]he management of the plant, the supervision of the working forces, the right to hire and discharge for cause shall rest exclusively with the Company," (2) "[t]he Company reserves the right to discharge or suspend any employee for proper cause" and (3) "discharge of an employee may be made a subject of grievance."

Article XV of the CBA permits a grievance regarding a discharge to be referred to arbitration. The jurisdiction and authority of the arbitrator "shall be confined exclusively to the

interpretation of the explicit provision or provisions of this Agreement at issue between the Company and the Union." The CBA prohibits an arbitrator from modifying provisions of the CBA or imposing a limitation or obligation on either party that is not provided for in the agreement.

Citgo's Employee Manual, which Kyle admits he received, identifies actions that result in discipline including discharge. The Employee Manual expressly states that "[e]mployee safety awareness has long been a guiding principle. Employees make safety an integral part of every task," ... and "refusing to cooperate or give testimony or giving false information on an accident or other investigation" "may result in severe disciplinary action or discharge." The Employee Manual also states that dishonesty or fraud is conduct that could result in discharge.

On February 17, 2014, the Union filed a grievance on Kyle's behalf; Citgo denied the grievance. The parties went to arbitration before Mark L. Reed. The parties stipulated that the issue before the Arbitrator was: "Was the grievant, Nick Kyle, terminated for just cause? If not what is the appropriate remedy?" The Arbitrator concluded that Kyle received a copy of the applicable Citgo Employee Manual, signed an Acknowledgment of Receipt for the same and admitted that he was aware that falsifying gauge readings could result in discipline up to termination. The Arbitrator also found that Kyle was aware of the proper procedure for recording tank gauging data. The Arbitrator determined that Kyle "did not have sufficient notice that violating the gauging procedure would be a transgression sufficient to result in discipline, including termination."[1] The Arbitrator further determined that the "Company has not documented that it took reasonable steps to advise the Grievant [Kyle] that the acceptable

---

[1] R. #17, p. 17.

practices related to it (i.e. the use of freebies and delaying data entry) had changed."[2] The Arbitrator sustained the grievance in part, finding that Kyle had engaged in wrongdoing, but ordered that Citgo nevertheless reinstate Kyle to his former position with back pay and benefits, minus any interim earnings and a one day suspension.[3] The Arbitrator relied on the seven tests of just cause made famous by Arbitrator Daughtery in determining that Kyle was not terminated for just cause.[4] Consequently, Citgo filed the instant Complaint to Vacate Arbitration Award.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, when viewed in the light most favorable to the non-moving party, indicate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[5] A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under governing law."[6] A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[7] As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim."[8] Once the movant makes this showing, the burden shifts to the non-moving party to set forth specific facts showing that there

---

[2] Id. p. 10.
[3] Id. p. 17.
[4] Id. p.7
[5] Fed. R. Civ. P. 56(c).
[6] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).
[7] Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999).
[8] Vera v. Tue, 73 F.3d 604, 607 (5th Cir. 1996).

is a genuine issue for trial.[9]  The burden requires more than mere allegations or denials of the

adverse party's pleadings.  The non-moving party must demonstrate by way of affidavit or other

admissible evidence that there are genuine issues of material fact or law.[10] There is no genuine

issue of material fact if, viewing the evidence in the light more favorable to the non-moving party,

no reasonable trier of fact could find for the non-moving party.[11] If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted.[12]

## ARBITRATION AWARD STANDARD

Review of an arbitration award under "both the LMRA and FAA remains extraordinarily

narrow."[13] Under the FAA:

> [A] district court may vacate an award only if: (1) the award was
> procured by corruption, fraud, or undue means; (2) there is
> evidence of partiality or corruption among the arbitrators; (3) the
> arbitrators were guilty of misconduct which prejudiced the rights
> of one of the parties; or (4) the arbitrators exceeded their powers.
> An additional ground for vacating an arbitration award is that in
> making the award the arbitrator acted with "manifest disregard for
> the law.[14]

In this case, Citgo has the burden of proving that any of the enumerated bases for vacating

an award actually occurred – and the reviewing court must resolve any doubts or uncertainties

in favor of enforcing the award.[15] In Steel Workers v. Enterprise Wheel & Car Corp.,[16] the court

---

[9] Anderson, 477 U.S. at 249.
[10] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).
[11] Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
[12] Anderson, 477 U.S. at 249-50.
[13] Int'l Chem. Workers Union, Local 683C of the United Food & Commercial Workers AFL-CIO v. Columbian Chems. Co., 331 F.3d 491, 495 (5th Cir. 2003).
[14] Id. (quoting Harris v. Parker College of Chiropractic, 286 F.3d 790, 792 (5th Cir. 2002)).
[15] Brabham v. A.G. Edwards & Sons Inc., 376 F.3d 377, 385 (5th Cir. 2004)(citing Action Indus., Inc. v. U.S. & Guar. Co., 358 F.3d 337, 343 (5th Cir. 2004)).
[16] 363 U.S. 593, 597 (1960).

held that a labor arbitration award "is legitimate only so long as it draws its essence from the collective bargaining agreement." In applying the "essence" test, the Fifth Circuit has stated that an arbitration award "must have a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement. . . . [T]he award must, in some logical way, be derived from the wording or purpose of the contract."[17] Thus, a court must affirm the award "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority."[18]

When an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice, then his decision may be unenforceable.[19] A court is only required to confirm an award if its basis "can be rationally inferred from the underlying contract."[20]

## LAW AND ANALYSIS

In this lawsuit and its motion for summary judgment, Citgo complains that the arbitrator exceeded his authority by imposing obligations on Citgo that were beyond those in the parties' CBA. In other words, the arbitrator exceeded his authority by holding Citgo to a higher standard than what was required by the CBA. Citgo argues that the Arbitrator's decision did not draw its essence from the CBA, ignores several of its provisions, and the reinstatement of Kyle violates important public policy interest, namely to ensure that important safety policies at Citgo are

---

[17] Executone Info. Sys., Inc. v. Davis, 26 F.3d 1314, 1325 (5th Cir. 1994).
[18] Weber Aircraft, Inc. v. General Warehousemen & Helpers Union Local 767, 253 F.3d 821, 824 (5th Cir. 2001).
[19] Stolt-Nielson S.A. v. Animal Feeds Int'l Corp., 130 S.Ct. 1758, 1767 (2010); Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001); see also Exxon Mobile Corp. v. Paper, Allied-Indus. Chem. & Energy Workers Int'l Union, Local 4-12, 383 F.Supp. 2d 877, 881 (M.D. La. 2005).
[20] Anderman/Smith Operating Co. v. Tenn. Gas Pipeline Co., 918 F.2d 1215, 1218 (5th Cir. 1990).

followed to avoid potentially catastrophic outcomes for employees and the community. Citgo seeks to vacate the arbitrator's award.

In their motion for summary judgment, defendants contend that there are no grounds for disturbing the arbitration award because the Arbitrator acted within his authority and his award was grounded in the parties' CBA. Defendants request summary enforcement of the award. Defendants argue that after the Arbitrator found that Kyle failed to follow proper procedure in violation of the revised September 2013 gauging procedures, the Arbitrator reviewed the terms of the CBA and Citgo's rules and concluded that he had authority to review and adjust the penalty given to Kyle based on the following reasons: (1) the revised gauging procedures were not expressly incorporated into the CBA; therefore they were not controlling; (2) "proper cause" was not defined in the CBA; and (3) the CBA does not limit the arbitrator's authority to modify or substitute a more appropriate penalty than that implemented by the Company.

Defendants remark that the CBA does not contain a list of offenses that will result in instant termination, nor does it contain a management rights clause stating that the employer has the right to establish and enforce work rules. In other words, the work rules do not state that a violation "shall" or "will" lead to termination. Thus, the work rules are ambiguous and make discharge permissible, not mandatory.  Defendants further point out that the revised gauging procedures do not mention any discipline at all for violating the procedures. Because the Employee Manual and revised gauging procedures were not expressly incorporated into the CBA, and the work rules and the gauging procedures were ambiguous, the arbitrator had authority to

interpret the work rules, gauging procedures and the CBA, making his decisions within the scope of his authority.

Defendants inform the court that the term "proper cause" was not defined in the contract but states that the Company may discharge and discipline for "proper cause." Article X of the CBA provides that Citgo may either "discharge" or "suspend" employees for "proper cause." Thus, defendants posit that the CBA is not sufficiently clear so as to deny the Arbitrator the authority to interpret the agreement as he did. The Arbitrator found that Kyle did not have sufficient notice that violating the gauging procedure would be a transgression sufficient to result in discipline, including termination, and that there was a basis in the rules and the CBA for a lesser penalty. The Arbitrator concluded that Citgo did not establish proper cause since it failed to provide adequate notice, a fair investigation, sufficient proof of guilt or equal treatment. Thus, it was reasonable for the Arbitrator to ultimately decide that "the Grievant [Kyle] has a significant record of service with virtually no previous discipline; a lesser punishment will ordinarily preclude repetition of the offense and will serve notice on other employees that dishonesty will not be tolerated."[21]

Defendants contend that the Arbitrator had the authority to modify the penalty because the CBA does not expressly prohibit the arbitrator from modifying the penalty imposed by Citgo. Defendants rely on section 283 of Article X of the CBA which provides in pertinent part:

> If a discharged employee is, pursuant to a decision reached under
> Article XV, found to have been unjustly discharged, he will be

---

[21] Defendants' exhibit C, p. 15.(the arbitrator noted that the penalty was excessively harsh and violated the concept of just cause).

reinstated in the employ of the Company subject to such penalty as the arbitrator might prescribe.[22]

Defendants argue that because the CBA permits disputes to be submitted to arbitration, and there is no limitation on the Arbitrator's authority to harmonize the employer's application of its progressive discipline policy with the just cause requirement of the contract, the Arbitrator was within his authority to detect a potential ambiguity between the "just cause" provisions of the CBA and the permissive language in the work rules in the Employee Manual.

In its motion for summary judgment and opposition to defendants' motion for summary judgment, Citgo refers the court to its Employee Manual which expressly provides that Citgo has the right to terminate an employee for dishonesty and/or fraud. Thus, Citgo maintains that it properly discharged Kyle for giving false statements during the investigation coupled with his violating the procedures with regard to the tank gauging by inputting false data into the IntelaTrac.

Citgo asserts that according to the CBA, the jurisdiction and authority of the arbitrator "shall be confined exclusively to the interpretation of the explicit provision or provisions of this Agreement at issue between the Company and the Union."[23] Furthermore, the CBA explicitly prohibits the Arbitrator from "modify[ing] any provisions of this Agreement or impos[ing] on either party hereto a limitation or obligation not explicitly provided for in this Agreement."[24]

The Arbitrator concluded that Kyle did not have sufficient notice that a violation of the tank gauging procedure could result in discipline up to termination. Citgo argues that the

---

[22] Defendants' exhibit A, p. 48.
[23] R. #17-2, Arb. Exhibit J-1,p. 35, ¶ 336.
[24] Id.

Arbitrator imposed an obligation on Citgo that was not provided for in the CBA when it required Citgo to provide "sufficient notice" to Kyle that violating the procedure at issue could result in discipline up to termination.[25] Citgo argues that in doing so, the arbitrator imposed his own brand of industrial justice because the CBA did not provide that Citgo must give any notice, let alone "sufficient notice" that violating a particular procedure could result in discipline up to termination.

Even though the Arbitrator conceded that the evidence showed that Kyle was aware of the procedure, the Arbitrator relied on the fact that the procedure had changed and concluded that the company had failed to document that Citgo took reasonable steps to advise Kyle that the acceptable practices related to it (i.e., the use of freebies and delaying data entry) had changed.

In this case, we must decide if the Arbitrator exceeded his authority by failing to draw the essence of his decision from the terms of the parties' collective bargaining agreement by reinstating Kyle with full back pay after Citgo terminated his employment for violating the company's procedures by falsifying data information and allegedly giving false statements during the investigation.[26] Federal courts are free to scrutinize an award to ensure that the arbitrator acted in conformity with the jurisdictional prerequisites of the collective bargaining agreement.[27]

---

[25] R. #17-3, p. 17.

[26] Houston Lighting & Power Co., f/k/a Utility Fuels, a/k/a Houston Indus. Inc., v. International Brotherhood of Electrical Workers, Local Union No. 66, 71 F.3d 179 (5th Cir. 1995).

[27] Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n, 889 F.2d 599, 602 (5th Cir. 1989) cert denied, 498 U.S. 853, 111 S.Ct. 148 (1990).

A court must set aside an arbitrator's decision if it fails to draw its essence from the CBA or if the arbitrator fashions his own brand of industrial justice.[28]

The relevant portions of the CBA are as follows:

- **Section 1. Right to Discharge or Suspend**

> 280   The management of the plant, the supervision of the working forces, the right to hire and discharge for cause shall rest exclusively with the Company.

> 281   Discharge of an employee may be made a subject of grievance under Article XV of this Agreement.

> * * *

> 283   If a discharged employee is, pursuant to a decision reached under Article XV, found to have been unjustly discharged, he will be reinstated in the employ of the Company subject to such penalty as the arbitrator might prescribe.

> 285   The Company reserves the right to discharge or suspend any employee for proper cause. . . .

> 288   It is the duty of all persons employed by the Company to comply with the safety and working rules as outlined in the Safety Manual and Employees Manual issued by the Company to all employees. . . .

> 336   The jurisdiction and authority of the arbitrator of a grievance and his opinion and award shall be confined exclusively to the interpretation of the explicit provision or provisions of this Agreement at issue between the Company and the Union. He shall have no authority to add to, detract from, alter, amend, or modify any provisions of this Agreement or impose on either party hereto a limitation or obligation not explicitly provided for in this Agreement.[29]

---

[28] Houston Lighting & Power Co v. Int'l Bd. Of Elec. Workers, Local Union No. 66, 71 F.3d 179, 182 (5th Cir. 1995)(citing Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n, 889 F.2d 599, 602 (5th Cir. 1989)).

[29] R. #17-3, Plaintiff's exhibit C.

Citgo further relies on its Employee Manual and the following relevant portions:

### SECTION D – DISCIPLINE

The Company believes that all employees wish to conduct themselves in a dignified and proper manner at all times. For this reason there should be a mutual understanding of the rules of proper conduct, and also for listing some of the offenses which, if committed, may result in severe disciplinary action or discharge. These violations are as follows:

\*\*\*

4.      Refusing to cooperate or give testimony or giving false information on an accident or other investigation . . . .

\*\*\*

21.      Dishonesty or fraud.

The Arbitrator concluded that Kyle received a copy of the above mentioned Employee Manual,[30] Kyle signed an Acknowledgment of receipt for the Employee Manual,[31] Kyle admitted that he was aware that falsifying gauge readings could result in discipline up to termination of his employment.[32] The Arbitrator further concluded that Kyle was aware of the proper procedure for recording the data.[33] The Arbitrator concluded that Citgo failed to document that it took reasonable steps to advise Kyle that the acceptable practices related to it (i.e., the use of freebies and delaying data entry) had changed.[34] To determine if Citgo properly terminated Kyle for "proper cause," the Arbitrator relied on the commonly referred "Seven Tests" set forth by Arbitrator Carroll Daugherty which provide a detailed evaluation of a disciplinary grievance:

---

[30] R. # 17-3, p. 8.

[31] R. #17-3, p. 9.

[32] Id.

[33] Id.

[34] R. #17-3, p. 10. ("Freebies" refers to an operator using an inspector's gauge reading to input data into the InteleTrac instead of the operator taking his own independent readings; delayed data entry occurred when the operator wrote his readings down on a piece of paper and input the data later making the gauge readings inaccurate when input).

1) **Notice:** Did the employer give the employee forewarning or foreknowledge of the possible or probable consequences of the employee's conduct?

2) **Reasonable Rule and Order:** Was the employer's rule reasonably related to business efficiency and the performance the employer might reasonably expect from an employee?

3) **Investigation:** Did the employer, before administering the discipline to the employee make an effort to discover whether the employee did in fact violate or disobey a rule or order of management?

4) **Fair Investigation:** Was the employee's investigation conducted fairly and objectively?

5) **Proof:** At the investigation, did the "judge" obtain substantial evidence of proof that the employee was guilty as charged?

6) **Equal Treatment:** Has the employer applied its rules, orders and penalties evenhandedly and without discrimination to its employees?

7) **Penalty:** Was the degree of discipline administered by the employer in a particular case reasonably related to (a) the seriousness of the employee's proven offense, and (b) the record of the employee and his service to the employer?

The Union posits that Kyle was not put on notice that he was being accused of dishonesty during the investigation, and that Citgo had not taken reasonable steps to advise Kyle that the acceptable practices related to the procedure (the use of freebies and delayed data entry) had changed. Nevertheless, the Arbitrator found that Kyle had attended a training session regarding the revisions to the tank gauging procedures,[35] and that Kyle "was aware of the Procedure."[36]

Citgo argues that the Arbitrator's award imposes obligations on the company that are not contained in the CBA—that Kyle be informed promptly and in sufficient detail of the charges against him, and that he be given the opportunity to respond to the charges."[37] Citgo further

---

[35] R. #17-2, p. 120.
[36] R. # 17-3, p. 8-9.
[37] R. #17-3, p. 11.

argues that the Arbitrator imposed a heightened burden of proof not required by the CBA when he held that "[f]or discharge for dishonesty to be upheld, the employer must provide proof beyond a preponderance of the evidence since discharge for dishonesty places a stigma on the employee."[38]

Thus, Citgo maintains that the Arbitrator "fashion[ed] his own brand of industrial justice,"[39] by imposing new and heightened standards on Citgo to which the Company never agreed in negotiating the CBA with the Union. Additionally, Citgo maintains that the Arbitrator violated the CBA which explicitly prohibits an arbitrator from "modify[ing] any provisions of this Agreement or impos[ing] on either party hereto a limitation or obligation not explicitly provided for in this Agreement."[40] Citgo argues that imposing such obligations is a clear sign that the arbitrator exceeded his authority under the CBA.[41]

Citgo maintains that the Arbitrator exceeded the authority granted to him in the CBA by disregarding Kyle's violation of work rules and/or procedures or modifying the Company's application of the rules and/or procedures. Citgo notes that the CBA prohibits and/or restricts the Arbitrator's authority – "the interpretation of the explicit provision or provisions of this Agreement at issue between the Company and the Union."[42] Furthermore, Citgo contends that

---

[38] R. #17-3, p. 17.
[39] Houston Lighting, 71 F.3d at 183 (citing Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n, 889 F.2d 599, 602 (5th Cir. 1989)).
[40] R. #17-2, p. 35 § 336.
[41] See Houston Lighting, 71 F.3d at 182-83 (finding the arbitrator exceeded his authority by applying his own standard of fairness in reassessing the employee's qualifications in light of the company's layoff decision); Valley Elec., 2008 WL 698235 at *5 (vacating an award where the arbitrator applied a good faith and fair dealing standard that did not appear in the CBA); Bruce Hardwood Floors v. UBC, Southern Council of Indus. Workers, Local Union No. 2713, 103 F.3d 449, 452 (5th Cir. 1997) (vacating an award where the arbitrator applied progressive discipline even though the CBA did not provide for progressive discipline in this instance).
[42] R. #17-2, p. 35 § 336.

the Arbitrator has no authority to interpret the company's work rules as provided in the Employee Manual. It is undisputed that Kyle violated the tank gauging procedures, he was aware of the proper procedure and the consequences for doing so.

In Delta Queen cited by Citgo, the company (Delta Queen) fired one of its riverboat captains for gross carelessness.[43] The collective bargaining agreement provided that "[t]he right to discipline and discharge for proper cause are [sic] likewise the sole responsibility of the Company." The arbitrator's award reinstated the captain, notwithstanding a finding of gross carelessness. The arbitrator determined that the captain was the victim of disparate company discipline citing the captain's untarnished 40 year work history and three prior mishaps—some involving substantial damage—as to which the responsible pilots suffered no disciplinary action. The arbitrator felt it would be unfair for the company to impose the draconian measure of termination.

The company appealed the award to the district court which reversed the arbitrator's award.[44] In its ruling affirming the district court, the Fifth Circuit relied on jurisprudence which held that a company and union may limit the discretion of the arbitrator in the collective bargaining agreement and in doing so it is possible to vest in the employer complete discretion over terminations which the arbitrator is not free to usurp.[45] The court held the arbitrator found "gross carelessness," he had impliedly found proper cause and was without authority under the

---

[43] Article VI of the agreement provided that "[n]o Officer shall be discharged except for proper cause such as, but not limited to, inefficiency, insubordination, carelessness, or disregard of the rules of the Company."
[44] United States District Court, Eastern District of Louisiana, Adrian G. Duplantier, J., granted summary judgment for the employer.
[45] See Bruno's Inc. v. United Food & Commercial Workers Int'l Union, 858 F.2d 15296 (11th Cir. 1988).

bargaining agreement to reinstate the captain. Thus, the district court properly vacated that portion of the arbitral award requiring reinstatement.

The Union takes issue with the absence of a definition of "proper cause" in the CBA. The Arbitrator considered the Seven Factors test delineated above to define "just cause." Ultimately, the Arbitrator reasoned that he had to determine whether the conduct warranted discipline, and if so, was the discipline imposed warranted given the circumstances.  The Arbitrator considered Kyle's prior service record and decided that "a lesser punishment will ordinarily preclude repetition of the offense."[46]  The Arbitrator ultimately concluded that there was just cause for discipline, but not discharge. The Arbitrator expressly found that Citgo "failed to establish the requisite cause necessary to uphold the Grievant's discharge from employment."[47] In the instant case, there has been no finding of "gross negligence."

Where a CBA requires a finding of "just cause" or "proper cause" to support a discharge, an arbitrator may make such a finding even without reciting the operative phrase.[48] Citgo contends that the Employee Manual clearly provided circumstances in which termination was possible—fraud, dishonesty and giving false information during an investigation. The Arbitrator determined that Kyle had falsified the gauge tank readings even though he was aware of the procedures set forth by the company, a violation of which could result in termination.  Thus, Citgo maintains that there was an implicit finding of just cause.  Kyle contends that the term "just

---

[46] R. #17-3, p. 15.
[47] R. #17-3, p. 17.
[48] See E.I. DuPont de Nemours and Co v. Local 900 of the Int'l Chem. Workers Union, AFL-CIO, 968 F.2d 456, 458 (5th Cir. 1992)(holding that the arbitrator implicitly found just cause when he concluded that the grievances had used marijuana on company premises) ;  Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs. Beneficial Ass'n, 889 F.2d 599, 602 (5th Cir. 1989). (holding that the arbitrator implicitly found just cause when he concluded that the riverboat captain was "grossly careless").

cause" in the CBA was an ambiguous term because it was not defined in the CBA which inherently caused the Arbitrator to perform an analysis under the "Seven Factor" test. The Arbitrator ultimately concluded that Kyle's conduct warranted discipline, but not termination.

The Arbitrator concluded that Citgo failed to prove that Kyle had intentionally falsified work records. The Arbitrator reasoned that because Kyle was responsible for gauging numerous tanks, and two and one-half months had passed when he was questioned about these three particular tanks, that Kyle could not say with certainty what he did on November 7, 2013 that caused the discrepancies. Kyle testified that at the initial meeting, when Pat Stevison asked him about the discrepancies, he responded with "I don't know" and after Pat informed him repeatedly that he [Pat] needed an answer to give to the company, Kyle's union representative, Joe, suggested possible scenarios, such as Kyle used the inspector's gauge readings. Kyle explained that he felt like he had to give an explanation. Kyle further testified as follows:

> Q: Why did you give him the explanations that you did?
> A: Because that's what he wanted. He wanted something, he needed something to tell, and that's why. I mean, I can't – like I said, this right here tells me nothing.
> Q. Did you ever say to him, "I don't know what happened, this is what happened?"
> A: No.
> Q: "On Tank 198 I used an outside inspector's gauging"?
> A: Absolutely not.
> Q: Did you say, "On Tank 199 I used an outside inspector's gauging and I was with him when he did it"?
> A: No. He said, "Do y'all go with inspectors when they gauge the tanks"? And I said, "We try to," and that was it. Whether he took it as I did or I didn't I told him we try to go with the inspectors. If we're busy we can't go with the inspectors.
> Q: Did you ever indicate at any time in that meeting that you knew why the errors had occurred?
> A: No.

Q: Did you make every possible effort to tell him that you were uncertain of what was the cause of the errors?
A: Right, that was my exact answer is, "I don't know."
Q: Were you attempting to be truthful in the meeting?
A: I was trying to help the man come up with a reasoning to give to the Company . . . Then I said, "Maybe I gauged the day before, maybe an inspector or whatever, and the tank it then came up and the next day the information was entered is the only thing we can come up with."[49]

The Arbitrator further held that Citgo was not even-handed when compared to other operators who were disciplined for the same or similar conduct. He expressly noted that "the Company treated the Grievant much more severely tha[n] it treated other operators accused of similar conduct."[50] There were several Citgo employees who were found to have faulty gauge readings of the tanks.  Of these employees, two were terminated (Kyle and one other employee were terminated for falsity and dishonesty), one was disciplined with a one-day suspension, two received verbal discipline and two received no discipline.[51]

We find that the CBA is not ambiguous.  It clearly establishes that an employee can be discharged for proper cause.[52]  It further expressly states that all Citgo employees have a duty to comply with the safety and working rules outlined in the Safety Manual and Employee Manual.[53]  It is undisputed that Kyle received a copy of the Employee Manual.  The Employee Manual clearly states that an employee can be disciplined for giving false testimony during an investigation and/or for dishonesty and/or fraud.  The Employee Manual expressly states that an employee can be disciplined and/or discharged for a violations of these work rules.  Citgo chose to discharge

---

[49] R. #17-1, p. 123-124. Tr. P. 487, ln. 11 – p. 489, ln. 4.
[50] R. #17-3, p. 15.
[51] Trial transcript exhibit 1, p. 110, lns. 7-11, R. #17-1.
[52] § 285 of the CBA.
[53] § 288 of the CBA.

Kyle because of the severity of the violations – falsifying data and giving false information during an investigation.

However, this court must resolve any doubts or uncertainties in favor of enforcing the award.[54] The Arbitrator found that Citgo had not proven that Kyle had lied in the investigation. Thus, Kyle could not have been terminated for dishonesty.  Removing the element of dishonesty places Kyle in the same category as the other employees who receive a much lesser degree of punishment for violating the work rules (tank gauging procedures).  Therefore, we find that the Arbitrator acted within the scope of his authority by reinstating Kyle to his former position.

By reaching the decision to affirm the award of the Arbitrator in this case, this court carefully considered the evidence pertaining to the paramount issue of dishonesty and/or fraud. We in no way condone those reprehensible qualities in an employee and feel that where there is clear evidence of such, an employer should be well within its rights to discharge an employee. In this case, the evidence of dishonesty and/or fraud was ambiguous and the Arbitrator who heard the testimony felt it was insufficient to make such a finding. At both interviews, Mr. Kyle was present with a union steward. The steward corroborated Mr. Kyle's version of what occurred during the interviews.  The court does not find a basis for disaffirming the Arbitrator's assessment of the evidence as to dishonesty and/or fraud.  The court suggests that in order to avoid such disputes in the future, the employer might consider either videotaping or audiotaping the interviews so there is no doubt what was said or the manner in which it was said. This technology has been available for many years and would have resolved the testimonial discrepancies beyond

---

[54] Brabham v. A.G. Edwards & Sons Inc., 376 F.3d 377, 385 (5th Cir. 2004)(citing Action Indus., Inc. v. U.S. & Guar. Co., 358 F.3d 337, 343 (5th Cir. 2004)).

any doubt. Whether the company chooses to employ the available technology in the future is a matter within it sole discretion, but its use in this case would have readily and unequivocally resolved the issue that was of prime importance in the eyes of this court.

## CONCLUSION

For the reasons set forth above, the motion for summary judgment filed by defendants will be granted and the motion for summary judgment filed by plaintiff will be denied.

**THUS DONE AND SIGNED** in chambers on this 29th day of March, 2016.

_____
**JUDGE JAMES T. TRIMBLE, JR.**
**UNITED STATES DISTRICT JUDGE**